IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **BRYNNA SCHELBAR PHILLIPS,** | ) |
| Plaintiff, | ) |
| v. | ) Case No. 21-CV-195-TCK-JFJ |
| **BOKF, NA, d/b/a BANK OF OKLAHOMA,** | ) |
| Defendant. | ) |

## OPINION AND ORDER

The Court has for its consideration defendant BOKF, NA, d/b/a Bank of Oklahoma's (BOKF or Defendant) motion for summary judgment (Doc. 37). Plaintiff Brynna Schelbar Phillips (Plaintiff) filed a response, (Doc. 58), and Defendant filed a reply, (Doc. 64).

This case arises from the termination of Plaintiff's employment as a Special Assets Manager III in Defendant's Special Assets Division (SAD). On January 15, 2019, Plaintiff received notice that her position was being eliminated due to reorganization of Defendant's credit administration department, following its June 2018 merger with CoBiz Financial (CoBiz). Plaintiff maintains that the reduction in force was merely pretext, alleging that Defendant was in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII). To that end, Plaintiff asserts claims against Defendant for disparate treatment based on gender under Title VII, for retaliation, and for intentional infliction of emotional distress (IIED).

In moving for summary judgment, Defendant counters that Plaintiff has failed to support her disparate treatment claim with evidence of gender discrimination; that Plaintiff has failed to show that a causal connection between her termination and a gender based protected activity; and

that Plaintiff's IIED claim is barred by the statute of limitations. For reasons discussed below, Defendant's Motion for Summary Judgment is **GRANTED**.

## I. FACTUAL BACKGROUND[1]

### A. Plaintiff's Employment at BOKF

On March 16, 2017, Defendant hired Plaintiff—a female with a law degree and more than ten years of experience in banking litigation—for the Special Assets Manager III position in its Special Assets Division (SAD), which is a branch of Defendant's credit administration department. (Docs. 37 at 7-8, ¶¶ 2-3; 58 at 2). Plaintiff was recruited for the position by BOKF human resources (HR), and her supervisor, Eric Ernst (Ernst), ultimately made the decision to hire Plaintiff. (Docs. 37 at 8, ¶ 7; 58 at 2). At the time of Plaintiff's employment and prior to the CoBiz merger, BOKF's SAD had six employees. (Docs. 37 at 8, ¶ 5; 58 at 2; 37-7). Of those employees, Plaintiff was the most recently hired SAD Manager III; the only other SAD employee hired after Plaintiff was Ross Pelton (Pelton), who was hired as a SAD Manager I. (Erst Dep. 207:17-210:24).

### B. Conflict Between Plaintiff and Ernst

The record reflects that the first year of Plaintiff's employment was relatively positive, if unremarkable. That appears to have changed, however, around February 2018, when Ernst had become angered after a disagreement with Plaintiff regarding a "loan workout" that Plaintiff was attempting to complete. (Doc. 37-16 at 4). Matters escalated even further in April 2018, when BOKF Chief Credit Officer (CCO) and Ernst's supervisor, Marc Maun (Maun), spoke directly to Plaintiff about a work matter, rather than going through Ernst—as would be the customary chain

---

[1] The following material facts are not genuinely in dispute, as set forth in Defendant's motion for summary judgment, Plaintiff's response in opposition to Defendant's motion, or in documentary evidence before the Court.

2

of communication. (*Id.*) Plaintiff states that Ernst construed Plaintiff's conversation with Maun to be evidence of Plaintiff going behind Ernst's back. (*Id.*) From that point on, Plaintiff alleges that Ernst began excluding her from vital meetings and failed to communicate with her about important work topics. (*Id.*)

The conflict between Plaintiff and Ernst eventually came to the attention of HR. In late May/early June 2018, Ernst exchanged several emails with Defendant's HR representatives, Ali Ferguson (Ferguson) and Scott Robin (Robin), concerning Plaintiff's inconsistent work hours and sporadic attendance at the office. (Doc. 58-7 at 4-18). Despite Ernst's request to send a written reprimand email to Plaintiff, HR instructed Ernst to have a verbal conversation with Plaintiff about her alleged absenteeism because Plaintiff was an exempt level employee. (*Id.* at 6).

The tensions reached a new pitch in August 2018 during an argument between Ernst and Plaintiff about a customer loan that was in trouble. (Phillips Dep. 62:24-63:21). Ernst came into Plaintiff's office at 4:00 p.m. on Friday, August 3, 2018, and proceeded to argue with Plaintiff in an "unprofessional and unreasonably aggressive manner" within earshot of two other SAD employees who were outside of Plaintiff's office. (Doc. 37-16 at 4). Ernst had become so agitated that he shut the door to Plaintiff's office, shoved his fist in Plaintiff's face, and said that they were going to do things "his way" in a threatening manner. (*Id.*) Plaintiff later described Ernst's tone during the confrontation as "yelling, like under his breath, like parents do to children," and Plaintiff further elaborated that Ernst closed her door with one hand while clenching his other hand in a fist over Plaintiff's desk and instructed Plaintiff to resolve the customer issue in the manner he saw fit. (Phillips Dep. 64-65). At 4:24 p.m. on August 3, 2018, Plaintiff called Defendant's employee resource center (ERC) to report the incident and held a brief phone interview, wherein Plaintiff

3

confirmed that her office had a window next to the door and that she did not call for help during the encounter. (Doc. 37-21).

Ultimately, HR did not substantiate Plaintiff's complaint regarding the August 3 incident, calling it a "he said/she said situation." (Doc. 23 at 1). Although it was not substantiated, Ernst agreed to refrain from future closed-door meetings with Plaintiff, and Plaintiff does not recall having met with Ernst alone after the August 3 incident. (Docs. 37 at 15; 58 at 7). During a follow-up of the incident, Plaintiff told the HR representative that she was disappointed by the fact that her complaint was found unsubstantiated, especially given that a credibility determination regarding the incident was made without having met with Plaintiff in person. (Doc. 37-23). However, in that same correspondence, Plaintiff declined HR's offer to interview other SAD employees about the incident because, as Plaintiff stated, "it was a small thing[,] and it would put everyone in an uncomfortable situation." (*Id.*; Phillips Dep. 159:21-22).

**C.  CoBiz Merger**

On June 18, 2018—around the time that Plaintiff's conflicts with Ernst were escalating—Defendant announced that it had entered into an Agreement and Plan of Merger with CoBiz Financial. (Doc. 37-8). Maun testified that, after the merger, the credit administration department had been tasked with achieving a specific target for expense reduction; and given that personnel-related expenses comprise over eighty percent of his budget, this likely required a reduction in force (RIF) for his department. (Maun Dep. 19:4-21). To that end, shortly after the merger announcement, Maun held a meeting with credit administration managers—including Ernst—and tasked the managers with submitting a recommendation regarding post-acquisition personnel for their respective divisions. (Maun Dep. 42:14-20). In preparing their proposals, Maun directed the managers to review the roster of employees and salaries within their division and develop a plan

4

that maximized efficiency in relation to their division's portfolio size. (*Id.* at 21:15-20, 71:1-17). Maun testified that he was responsible for final approval of the managers' recommendations, though he would have reviewed the recommendations with his HR "business partner," Jeff Reid, before approving any recommendation. (*Id.* at 44:14-20). While "reduction in force" may not have been the term used to describe this process, Maun stated that "it was certainly intended to be a reduction in force." (*Id.* at 47:2).

Ernst testified that he understood SAD to be a prime target for reduction in force because CoBiz had its own special assets division and, thus, there would be considerable duplication within the division post-merger. (Ernst Dep. 109:1-13). Ernst undertook the process for developing a recommendation for his division in early July 2018, and he testified that the process took approximately six weeks to complete. (*Id.* at 114:10-115:6). Ernst maintains that tenure and banking experience were among the primary factors that he took into consideration when making his recommendations, though he stated that he also considered an employee's skillset specialization, workout capacity, and caliber of work. (*Id.* at 115:6-14, 132:3-16).

The combined number of CoBiz and BOKF SAD employees at the time of the merger was thirteen, and Ernst endeavored to reduce the post-merger department personnel to eight. (Docs. 37-9; 37-12; 58-3). The following is a summary of the SAD employees from both BOKF and CoBiz, and Ernst's final personnel recommendations for the integration of CoBiz and BOKF special assets divisions:

1. Eric Ernst: Remain as Manager of SAD (BOKF employee with 25 years of banking tenure);

2. Mike Leatherland: Remain as SAD Manager III (BOKF employee with seven years of banking experience);

3. Julie Chase: Transfer to Tulsa as SAD Manager IV (17-year CoBiz tenure and was the head of the CoBiz special assets group);

4. Brian Bowden: Remain in Denver, Colorado as SAD Manger III (15 years of banking experience and earned top 10% grade on his last performance appraisal as CoBiz special assets portfolio manager);

5. Nancy Snyder: Remain in Denver, Colorado as SAD Manager III (30 years of banking experience and earned a top 10% grade on her last performance appraisal as CoBiz special assets portfolio manager);

6. Ross Pelton: SAD II (4 years of banking experience, was hired by BOKF as SAD Manager I shortly after Plaintiff, and he was the only person in the combined SAD, aside from Ernst, capable of preparing "spreads"[2]);

7. Nancy Berardi: Create new position to remain in Denver, Colorado as a non-administrative assistant role for SAD (5 years of workout experience);

8. Kathy Norrid: SAD Administrative Assistant III;

9. Andy Jamrozy: SAD Manager III (planning to retire in 2019);

10. Laurie Laudeman[3]: RIF candidate (20 years of banking experience, and though Ernst stated that his preference was to have her remain with SAD after integration, she had received a lower performance appraisal score than Snyder and Bowden);

11. Brynna Schelbar Phillips (Plaintiff): RIF candidate (18 months BOKF tenure);

12. Julie Smolar: Resigning; and

13. Barbara Grant: RIF candidate (Arizona Business Bank administrative assistant, no need for that resource without an Arizona office).

(Docs. 58-3; 37-9; 37-7; 37-12; 37-26). Although Ernst testified that his decision to include Plaintiff in his RIF recommendation was based on tenure and experience, (Ernst Dep. 250:10-21),

---

[2] According to Maun, "spreading" is when a series of financial statements are placed "into a financial spread that allows you to analyze them across time." (Maun Dep. 53:13-25). This apparently eases the process for calculating "appropriate financial ratios" and to "evaluate cash flow." (*Id.*) Plaintiff testified that the only other person in the SAD group that was capable of preparing spreads was Ernst. (Phillips Dep. 116:7-20).
[3] Although Laurie Laudeman was listed as an RIF candidate in Ernst's final recommendation to Maun, she was ultimately not terminated, and she remained with BOKF until her retirement in approximately 2021. (Maun Dep. 99:5-12). Laudeman's title post CoBiz integration appears to have been SAD Manager III. (Doc. 37-26).

his RIF memo to Maun justified his recommendation by stating: "[Plaintiff] essentially acted the part until about six months into employment and then the genuine issues occurred. She has provided some value since hire, but the value is being heavily outweighed by negative factors impacting the rest of the staff." (Doc. 58-3 at 4). Ernst's changing explanations aside, Plaintiff does not present any evidence that there was a SAD Manager III with less tenure than her that was not terminated from employment. The evidence also establishes that the only employee among the integrated group with less seniority than Plaintiff was Ross Pelton, who was a SAD Manager II with spreading capabilities and primarily filled a support role for the team. (Doc. 58 at 2, ¶ 8; Maun Dep. 83:20-84:6; Ernst Dep. 207:17-210:24).

### D. Plaintiff's Termination and Final Months of Employment

On October 1, 2018, BOKF finalized the CoBiz merger. (Docs. 37 at 5, ¶ 14; 58 at 4, ¶ 14). Ernst's recommendation to include Plaintiff in the RIF was approved by Maun, and the decision was finalized by October 2018. (Maun Dep. 81:24-82:4). Maun held a meeting with his HR business partner, Jeff Reid, on October 19, 2018, and it was determined that Plaintiff would be included in the integration's "second wave" of RIF, meaning that termination of Plaintiff's position would occur within the "January [2019] time frame." (*Id.* at 82:14-17; Doc. 37-14).

On November 9, 2018—after Defendant decided to terminate Plaintiff's position, but before Plaintiff received notice of the termination—Plaintiff had another confrontation with Ernst during her annual performance review. (Phillips Dep. 79:16-24; Doc. 58-5). Plaintiff maintains that, in advance of the meeting, she was provided a copy of her yearly goals that were different than the goals that she had previously been provided, and consequently, her performance review reflected that Plaintiff had not met her annual goals. (Phillips Dep. 80:3-24). All of this came to a head during the November 9 meeting attended by Plaintiff, Ernst, and Robin. (Doc. 58-5 at 3).

Plaintiff became upset at one point during the meeting because Ernst apparently called Plaintiff a liar on three separate occasions, and Plaintiff claimed that "Ernst had his hands clenched into fists, berated her[,] and exhibited aggressive body language." (*Id.*) Compounding Plaintiff's frustration was the fact that Robin passively observed the confrontation without attempting to intervene or deescalate the situation. (*Id.*) It was also during this meeting that Plaintiff revealed to Ernst and Robin that she was pregnant. (Phillips Dep. 82:20-23). Aside from the statements documented in Plaintiff's subsequent HR complaint, Plaintiff could not recall any specific statements made during the November 9 meeting. (*Id.* at 82:1-23). Plaintiff also acknowledges that Defendant had paid her a discretionary bonus for 2018, despite the adversarial nature of the November 9 performance review. (Docs. 37 at 11, ¶ 18; 58 at 5, ¶ 18).

Plaintiff eventually received her notice of termination from Defendant on January 15, 2019. (Doc. 37-15). The notice provided that Plaintiff's last day of work would be January 15, 2019, and that Plaintiff's effective termination date would be July 31, 2019. (*Id.*) Defendant had changed Plaintiff's effective termination date from the standard 30 days of notice pay and severance, which is equivalent to eight weeks base pay. (Doc. 37-13). Maun testified that the purpose of deviating from the standard effective termination date was because Defendant learned Plaintiff was pregnant and would become eligible for FLMA leave. (Maun Dep. 107:20-111:5). The practical effect of extending Plaintiff's termination date was that Plaintiff would continue to receive full salary and health benefits through July 31, 2019—in addition to her 30-day notice pay, unused prorated vacation leave, and severance (equivalent to eight weeks base pay)—though not requiring Plaintiff to come to work. (Doc 37-6; Phillips Dep. 124, 139-40, 141). Thus, the record reflects that Defendant deposited payroll and severance into Plaintiff's Bank of America account through

September 13, 2019, and all told Plaintiff received $107,811.05 from Defendant between January 15 and September 13, 2019.[4]

**E.  EEOC Charge and Subsequent Litigation**

On November 7, 2019, the Equal Employment Opportunity Commission (EEOC) received Plaintiff's signed Charge of Discrimination against Defendant, which alleged retaliation and discrimination on the basis of gender, sex, and pregnancy in violation of Title VII. (Doc. 37-16). In light of Plaintiff's EEOC charge filing date, the only adverse employment event that is not barred by the 300-day limitation period is the notice of termination that Plaintiff received on January 15, 2019. Thus, to the extent that the August and November 2018 confrontations with Ernst are actionable under Title VII, any such claim would be barred by the 300-day limitation period for filing a charge with the EEOC. Plaintiff concedes as much, but she maintains that those events should nevertheless be considered as circumstantial evidence for the discrimination claim. (Doc. 58 at 9, 16-18).

Plaintiff filed suit against Defendant in the District Court of Tulsa County, Oklahoma on April 8, 2021. (Doc. 2-1). The complaint[5] raises three claims against Defendant, namely: 1) discriminatory disparate treatment based on gender in violation of Title VII ; 2) retaliation in violation of Title VII; and 3) IIED. (*Id.* at 6-7). Defendant timely removed the case to this Court based on federal question jurisdiction over Plaintiff's Title VII claims and supplemental

---

[4] Plaintiff's September 13, 2019, paystub reflected a total gross pay for 2018 in the amount of $112,978.05. (Doc. 37-6 at 30). Plaintiff received her normal payroll check for the January 1 through January 15 pay period on January 15, 2019, which was in the amount of $5,167. (*Id.* at 12). Thus, $107,811.05 is the total amount Defendant paid to Plaintiff after the notice of termination.

[5] Although Plaintiff's initial pleading filed in state court was originally styled as the petition, (Doc. 2-1), the Court will refer to that document as the complaint, in keeping with the title given to initial pleadings in federal court.

jurisdiction over Plaintiff's state-law IIED claim. (Doc. 2). Defendant now moves for summary judgment, arguing in relevant part that Plaintiff has failed to establish the requisite elements of her discrimination and retaliation claims and that Plaintiff's IIED claim is barred by the statute of limitations.

Plaintiff does not respond to Defendant's argument that her IIED claim was filed more than two years after the operative events giving rise to her claim occurred. (Docs. 37 at 27-28; 58; 64 at 9). Given that Oklahoma's statute of limitations on IIED claims is two years and that the complaint was filed more than two years after Plaintiff's alleged conflict with Ernst and Defendant, Plaintiff's IIED claim must be dismissed. Plaintiff does, however, respond to Defendant's arguments regarding her Title VII claims. The Court now turns to address Plaintiff's Title VII claims against Defendant.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). In its summary judgment analysis, the Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id*. However, the party seeking to overcome a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A movant that "will not bear the burden of persuasion at trial need not negate the nonmovant's claim," but may "simply . . . point[] out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*,

144 F.3d 664, 671 (10th Cir. 1998) (internal citations omitted). If the movant makes this prima facie showing, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citing Fed. R. Civ. P. 56(e)). To meet this burden, the nonmovant must set forth facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)). "In response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) (internal citations omitted).

### III. DISCUSSION

#### A. Title VII Disparate Treatment Claim

The Court notes at the outset that the complaint premises Plaintiff's gender discrimination claim on disparate treatment with respect to discipline, promotions, and progress reviews. (Doc. 2-1 at 6). However, Plaintiff's response to summary judgment appears to reroute that claim, citing only Plaintiff's termination as the adverse employment event giving rise to gender discrimination under Title VII. (Doc. 58 at 18). It is well established that an employee alleging discrimination and retaliation must file a Charge within 300 days of the alleged unlawful act. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Given that "each discrete incident of [discriminatory] treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted," *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003), Plaintiff's

termination is the only adverse employment event that is not barred by the 300-day limitation period for filing a charge with the EEOC. As the Supreme Court has held, however, the 300-day limitation period does not "bar an employee from using prior acts as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. Therefore, the Court analyzes only Plaintiff's termination, though Plaintiff's allegations that predate the 300-day limitation period are considered only to the extent that they provide background evidence in support of Plaintiff's timely claim.

Title VII prohibits an employer from discharging "any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To prevail, "a plaintiff must show, through either direct or indirect evidence, that the discrimination was intentional." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000). "When a plaintiff asserts a sex or age discrimination claim but cannot produce any direct evidence of discrimination, as here, the burden-shifting framework announced in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802-805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972), applies." *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Pursuant to this framework, a Title VII plaintiff has the "burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002); *Neal v. Roche*, 349 F.3d 1246, 1248 (10th Cir. 2003).

As a preliminary matter related to the elements of Plaintiff's prima facie case, the Court notes that Plaintiff disputes the characterization of her termination as a reduction in force, arguing that the phrase "reduction in force" was never used to describe the CoBiz/BOKF integration and that the RIF label was unique to her termination. (Doc. 58 at 4, 12-13). To her point, Maun testified that the Defendant referred to the reduction of expenses from integration as "synergies," as opposed to reductions in force, and he was not certain that the term "reduction in force" was ever officially used. (Maun Dep. 18:5-24; 46:12-47:2). The Court, however, finds that the semantic

12

incongruency highlighted by Plaintiff is a distinction without a difference. That Defendant replaced the term RIF with a nebulous euphemism does not create a triable issue of fact. To the contrary, the evidence in the record uniformly pulls in the same direction. Specifically, Maun was unequivocal that his instruction to credit administration managers had the practical effect of reducing the total department personnel among the two companies after the merger. (*Id.* at 46:12-17). Additionally, Ernst clearly understood Maun's orders to the managers as proposing recommendations for a reduction in force, as is evidenced by his emails consistently referring to reductions in force and appearing to reach a 40% reduction in personnel. (Docs. 37-9; 37-12; 58-3). Given that Plaintiff herself cited "Position Elimination" as the reason for ending her employment with BOKF, the Court is not persuaded that her apparent about-face on the RIF issue presents a genuine issue of fact. (Doc. 58-6 at 4). In light of the foregoing, the Court finds that there is no genuine issue of material fact that Defendant undertook a reduction in force following its acquisition of CoBiz, and thus, the Court analyzes Plaintiff's prima facie case under the RIF framework.

To establish a prima facie case of discrimination in the RIF context, courts in this Circuit have required Title VII plaintiffs to show: (1) that she is within the protected gender group; (2) that she was doing satisfactory work; (3) that she was discharged despite the adequacy of her work; and (4) that there is some evidence the employer intended to discriminate against her in reaching its RIF decision. *Brainard v. Topeka*, 597 Fed. App'x. 974, 978 (10th Cir. 2015); *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1167, n. 4 (10th Cir.1998) (noting that the prima facie case for gender discrimination in RIF context is the same framework for age claims); *Morrow v. Oklahoma Dep't of Rehab. Servs.*, 2016 WL 9022591, at *3 (W.D. Okla. Nov. 3, 2016) (applying RIF framework to termination as part of restructuring job duties). Here, the parties do not dispute that Plaintiff is

a member of a protected class, and the Court assumes for the purposes of summary judgment that Plaintiff has carried her burden with respect to the second and third elements. Thus, the Court turns to the fourth element of Plaintiff's claim, that is, whether there is evidence that Defendant intended to discriminate against Plaintiff in reaching its RIF decision.

"The fourth element may be established through circumstantial evidence that the plaintiff was treated less favorably than . . . male employees during the RIF." *Brainard*, 597 Fed. App'x. at 978 (alterations and internal quotations omitted). To that end, there is a rebuttable presumption of discriminatory intent when a plaintiff presents evidence that the defendant terminated qualified female employees but retained similarly situated male employees. (quoting *Beaird*, 145 F.3d at 1165). In analyzing similarly situated employees, "[a] court should . . . compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)). Here, Plaintiff presents two comparators, namely, Mike Leatherland and Ross Pelton. Specifically, Plaintiff argues that Mike Leatherland, a SAD Manager III, retained his position after the CoBiz acquisition, received more respect from Ernst, and was not berated by Ernst in front of Plaintiff. (Doc. 58 at 9-10). Plaintiff also asserts that Ross Pelton—who was less experienced than Plaintiff—was not merely retained after the integration, he was promoted and trained to take over Andy Jamrozy's portfolio. (*Id.* at 10, 13, 19).

The Court is not persuaded that Plaintiff's proposed comparators are sufficiently similar to establish the fourth element of her prima facie case. Specifically, Mike Leatherland was more tenured than Plaintiff. (Phillips Dep. 117:16-19). Aside from Plaintiff's perception that

Leatherland received more respect from Ernst, Plaintiff does nothing to address the fact that Leatherland was more tenured than Plaintiff, nor does Plaintiff present evidence to suggest that any differences in treatment were attributable to gender. (Phillips Dep. 114:2-115:11). With respect to Pelton, the record reflects that Pelton's position was SAD II and that he possessed spreading capabilities. The SAD II position is primarily a support role, as opposed to the SAD Manager III position that Plaintiff held, and though Pelton was trained to take over Andy Jamrozy's portfolio, Andy Jamrozy was a SAD II after the integration. (Maun Dep. 53:27; Doc. 37-26). Further, the evidence reflects that Pelton was particularly critical for SAD because he was the only support personnel in the group capable of doing spreads, and SAD managers—including Plaintiff during her tenure as SAD Manager III—relied on spreads for their black book reports on "large, complex, troubled loans." (Phillips Dep. 68:11-22, 116:5-20). Given that Plaintiff does not account for differences in title, responsibilities, or tenure, the Court must conclude that Plaintiff has failed to establish that Pelton and Leatherland are sufficient comparators for purposes of the fourth element of Plaintiff's prima facie case. *See Brainard*, 597 F. App'x at 979 (holding that male employee was not similarly situated when he had the same title but different responsibilities and more experience).

In addition, Plaintiff does not dispute that the majority of retained CoBiz employees in the integrated SAD group were female, nor does Plaintiff dispute that she was the least tenured among the BOKF/CoBiz SAD managers. (*See* Docs. 37 at 9, ¶ 9; 58 at 3, ¶ 9).[6] At most, Plaintiff's

---

[6] Although Plaintiff partly disputed Defendant's statement of fact regarding the female CoBiz employees, Plaintiff provided only two reasons for her dispute: 1) "The evidence to which Defendant cites indicates that Nancy Berardi was "NOT RETAINED/RIF"; and 2) "nothing to which Defendant cites indicates that Ms. Berardi had 14 years' experience with CoBiz." (Doc. 58 at 3, ¶ 9). However, Plaintiff's disputes do not create a genuine issue of fact because Plaintiff later

15

evidence establishes that she had a contentious relationship with Ernst, which clearly influenced his RIF recommendation. (*See* Doc. 58-3 at 4) ("Brynna essentially acted the part until about six months into employment and then the genuine issues occurred. . . . the value [she provides] is being heavily outweighed by negative factors."). By Plaintiff's own account, the conflict with Ernst first began during a disagreement regarding a loan workout, when Plaintiff refused to concede her position. (Doc. 37-16 at 4). The problem escalated when Plaintiff spoke directly with Maun without first going through Ernst. (*Id.*) Although Plaintiff maintains that Ernst treated her with less respect than her male counterparts, that belief is based purely on inarticulable perceptions. (Phillips Dep. 114:4-19). On its face, the fact that Ernst did not berate male employees in front of Plaintiff is no more attributable to gender than it is to a personality conflict with Plaintiff. Yet, there is ample evidence in the record that tends to show a personality conflict between Ernst and Plaintiff, while the only support for gender discrimination is Plaintiff's subjective belief. Simply stated, "[t]he evidence suggest[s] that [Plaintiff] was treated differently from other employees due to a personality conflict with [Ernst]," which is not sufficient to create an inference of discrimination. *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004).

Because Plaintiff has failed to show by a preponderance of evidence that Defendant intended to discriminate against Plaintiff's gender in reaching its RIF decision, Plaintiff has not carried the burden of establishing her prima facie discrimination case. Accordingly, Defendant is entitled to summary judgment with respect to Plaintiff's Title VII discrimination claim.

**B. Retaliation**

---

admits that Nancy Berardi was retained after the integration, and the evidence establishes that Berardi had greater tenure than Plaintiff. (*See* Docs. 37-10; 37-12; 58 at 13, ¶ B3).

Title VII makes it an unlawful employment practice for an employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Like her discrimination claim, Plaintiff's retaliation claim is subject to the *McDonnell Douglass* burden-shifting framework. *See Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009). In order to establish a prima facie case of retaliation, Plaintiff must show that: (1) she was engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged employment action to be materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse employment action. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

In order to meet the first element of her prima facie case, Plaintiff must demonstrate that she opposed a "practice made an unlawful employment practice by Title VII." *Zokari*, 561 F.3d at 1081. "Opposition" can be protected even if a plaintiff is wrong about whether her employer had, in fact, engaged in a violation of Title VII; instead, it is enough that a plaintiff had a "good faith belief that Title VII ha[d] been violated." *Peterson v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002). "But a vague reference to discrimination and harassment without any indication that this misconduct was motivated by [a] category protected by Title VII[] does not constitute protected activity and will not support a retaliation claim." *Anderson*, 122 F. App'x at 916. "To oppose plain vanilla rude and unfair conduct by [a supervisor] is not oppose conduct 'made an unlawful practice by [Title VII].'" *Petersen*, 301 F.3d at 1188 (second alteration original). In this case, Plaintiff argues that she engaged in protected opposition when she filed complaints with Defendant's ERC and HR departments "on an ongoing basis between August and November 2018." (Doc. 58 at 22).

The Court disagrees that Plaintiff's ERC and HR complaints qualify as protected opposition to discrimination because neither of Plaintiff's complaints "convey[ed] a concern that her employer engaged in a discriminatory practice made unlawful under Title VII." *Bowers v. Medical Park Center Pharmacy*, 2009 WL 2916893, *5 (N.D. Okla., Sept. 4, 2009). Rather, Plaintiff contacted Defendant's ERC in August 2018 "regarding [a] manager conflict [with] Eric Ernst," with Plaintiff stating that "Ernst showed threatening behavior towards [her]." (Doc. 58-8 at 2). In fact, Plaintiff told Defendant's HR that her August 2018 confrontation with Ernst "was a small thing[,] and it would put everyone in an uncomfortable situation" to interview other SAD employees about the situation. (Phillips Dep. 159:21-22). Plaintiff's second complaint in November 2018 was also categorized as a "manager conflict [with] Eric Ernst." (Doc. 58-5 at 3). Plaintiff's correspondence with Defendant's ERC reflects that Plaintiff took particular exception to Ernst "personally attacking [her] character and calling [her] a liar." (*Id.* at 4-5). While Plaintiff did note that she was pregnant in her November email to ERC, there was no suggestion that her complaint was related to her pregnancy or gender. (*Id.*) Furthermore, the decision to terminate Plaintiff had already been made in October 2018. (*Id.*; Maun Dep. 81:24-82:4).

Aside from a passing reference to pregnancy—after the decision to terminate Plaintiff had been made—Plaintiff does not even make so much as a vague reference to gender-based discrimination in her communications with ERC. Although it is clear that Plaintiff was frustrated by Ernst's behavior, her complaint had no relation to gender-based discriminatory conduct that would implicate Title VII. Further, even if Ernst decided to include Plaintiff in the RIF after being notified of Plaintiff's ERC complaint in August 2018, Ernst's retaliation is not unlawful under Title VII because Plaintiff's complaint was not a protected activity. *Anderson*, 122 F. App'x at 916. Based on the undisputed material facts, no reasonable juror would find that Plaintiff's ERC

complaints constitute protected opposition to discrimination under Title VII. Because Plaintiff has not established her prima facie case of retaliation, the Court must grant Defendant's motion for summary judgment on Plaintiff's retaliation claim.

## IV. CONCLUSION

Plaintiff has conceded that her IIED claim is barred by the statute of limitations, and thus, that claim must be dismissed. Additionally, because Plaintiff has failed to establish her prima facie case with respect to her Title VII claims of discrimination and retaliation, those claims must also be dismissed. Accordingly, Defendant's motion for summary judgment (Doc. 37) is **GRANTED**, and final judgment terminating the case shall be entered.

**IT IS SO ORDERED** this 1st day of May, 2023.

TERENCE C. KERN
United States District Judge